IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| MEDIA RIGHTS TECHNOLOGIES, INC., )<br>)<br>Plaintiff, )<br>v. )<br>)<br>CAPITAL ONE FINANCIAL )<br>CORPORATION, *et al.*, )<br>)<br>Defendants. )<br>_____) | Civil Action No. 1:13-cv-476 |

## OPINION AND ORDER CONSTRUING CLAIMS

This matter is before the Court for construction of the relevant claims in U.S. Patent No. 7,316,033 (the "'033 patent"). The parties have submitted briefs setting forth their proposed constructions, and the Court held a claim construction hearing on November 5, 2013. For the reason stated herein, the Court finds and concludes that the terms "compliance mechanism" and "custom media device" are indefinite and that all of the claims asserted in the '033 patent are therefore invalid and unenforceable.

## I. INTRODUCTION

Plaintiff Media Rights Technologies, Inc. ("Media Rights") filed suit on April 19, 2013, alleging that Defendants Capital One Financial Corporation, Capital One Bank (USA), NA, and Capital One, NA (collectively, "Capital One") infringed the '033 patent.[1] The '033 patent is entitled "Method of Controlling Recording of Media." The patent includes twenty-seven claims, which fall into three groups: Claims 1-9 cover a "method of preventing unauthorized recording of electronic media"; Claims 10-18 cover a "computer readable medium having computer implementable instructions embodied therein, said instructions for causing a client system to perform a method of restricting recording of media content"; and Claims 19-27 cover a "system

---

[1] The '033 patent was issued to Music Public Broadcasting, Inc., Media Rights' predecessor, on January 1, 2008.

of preventing unauthorized recording of electronic media." '033 patent at 36-38. Claims 2-8, 11-18, and 20-27 add additional detail to the independent claims, Claims 1, 10, and 19 respectively. All of the claims are based on the same basic steps. As described in Claim 1, these steps consist of:

> [1] activating a compliance mechanism in response to receiving media content by a client system, said compliance mechanism coupled to said client system, said client system having a media content presentation application operable thereon and coupled to said compliance mechanism;
>
> [2] controlling a data output path of said client system with said compliance mechanism by diverting a commonly used data pathway of said media player application to a controlled data pathway monitored by said compliance mechanism; and
>
> [3] directing said media content to a custom media device coupled to said compliance mechanism via said data output path, for selectively restricting output of said media content.

'033 patent at 36:20-34.

## II. STANDARD

It is the exclusive duty of the Court to construe disputed claim language of the patent at issue. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). Generally, the words of the claim are to be given their "ordinary and customary meaning," that is, the meaning they would have "to a person of ordinary skill in the art in question at the time of the invention." *Phillips v. AHW Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005). "[I]n interpreting an asserted claim, the court should look first to the intrinsic evidence of record, *i.e.*, the patent itself, including the claims, the specification, and, if in evidence, the prosecution history." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). However, the court may also consider extrinsic evidence, including, for example, treatises, dictionaries, and expert testimony. *Phillips*, 415 F.3d at 1317-18. The

specification "is the single best guide to the meaning of the disputed term." *Vitronics Corp.*, 90 F.3d at 1582.

Title 35 U.S.C. § 112, ¶ 2 requires that every patent's specification "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor . . . regards as his invention." A claim that fails to satisfy this particularity requirement is invalid for indefiniteness. "The primary purpose of the definiteness requirement is to ensure that the claims are written in such a way that they give notice to the public of the extent of the legal protection afforded by the patent, so that interested members of the public, *e.g.*, competitors of the patent owner, can determine whether or not they infringe." *All Dental Prodx, LLC v. Advantage Dental Prods., Inc.*, 309 F.3d 774, 779-80 (Fed. Cir. 2002).

Indefiniteness is a matter of claim construction, and "general principles of claim construction apply." *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1348 (Fed. Cir. 2005). "Only claims not amenable to construction or insolubly ambiguous are indefinite." *Source Search Tech., LLC v. LendingTree, LLC*, 588 F.3d 1063, 1076 (Fed. Cir. 2009) (internal quotation marks omitted). Patents are presumed valid, and an alleged infringer asserting that a claim term is indefinite must prove "by clear and convincing evidence that a skilled artisan could not discern the boundaries of the claim based on the claim language, the specification, and the prosecution history, as well as her knowledge of the relevant art area." *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1249-50 (Fed. Cir. 2008).

A claim to the means of accomplishing a particular task may constitute a "means-plus-function" claim falling within the scope of 35 U.S.C. § 112, ¶ 6. Title 35 U.S.C. § 112, ¶ 6 provides that "[a]n element in a claim for a combination may be expressed as a means or step for

3

performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." Thus, "§ 112, ¶ 6 operates to restrict claim limitations drafted in such functional language to those structures, materials, or acts disclosed in the specification (and their equivalents) that perform the claimed function." *Personalized Media Commc'ns, LLC v. Int'l Trade Comm'n*, 161 F.3d 696, 703 (Fed. Cir. 1998). "Means-plus-function claiming applies only to purely functional limitations that do not provide the structure that performs the recited function." *Phillips*, 425 F.3d at 1311. There is a rebuttable presumption that § 112, ¶ 6 applies if the word "means" appears in the claim language. *Trimed, Inc. v. Stryker Corp.*, 514 F.3d 1256, 1259 (Fed. Cir. 2008).

When construing a means-plus-function claim, the court must first identify the function stated by the claim. *Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1428 (Fed. Cir. 1997). Next, the court must identify the corresponding structure disclosed in the specification that performs the claimed function. *Id.* The patentee will then be limited to claiming the disclosed structure and its equivalents. *Kahn v. Gen. Motors Corp.*, 135 F.3d 1472, 1476 (Fed. Cir. 1998). A structure disclosed in the specification is a "corresponding structure" only if "the specification or prosecution history clearly links or associates that structure to the function recited in the claim." *B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997). In order to satisfy the definiteness requirement of § 112, ¶ 2, the specification must disclose the corresponding structure "in such a manner that one skilled in the art will know and understand what structure corresponds to the means limitation." *Atmel Corp. v. Info. Storage Devices, Inc.*, 198 F.3d 1374, 1382 (Fed. Cir. 1999).

4

## III. CLAIMS

The parties dispute the construction of twenty-four terms and agree on the construction of one term. Because the terms "compliance mechanism" and "custom media device" play a central role in every claim of the '033 patent, the Court begins its claim construction with those terms.

### A. Compliance Mechanism

As an initial matter, the parties dispute whether "compliance mechanism" is a means-plus-function term. As Media Rights notes, the term does not use the word "means" and is therefore presumed to fall outside of § 112, ¶ 6. *Watts v. XL Sys., Inc.*, 232 F.3d 877, 880 (Fed. Cir. 2000). However, Capital One can rebut that presumption by showing that the claim element recites a function without reciting sufficient structure for performing that function. *Id.*

A claim phrase will not be construed as a means-plus-function term if it "denotes a type of device with a generally understood meaning in the [relevant area]." *Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1360 (Fed. Cir. 2004) (noting that, in a previous Federal Circuit case, the court found that the term "detent mechanism" was not subject to § 112, ¶ 6 because "detent" connoted a type of device with a generally understood meaning in the mechanical arts). Media Rights does not contend that "compliance mechanism" denotes a particular type of device with a generally understood meaning in the field; and courts have recognized that the term "mechanism" does not call to mind any particular structure. *See Mass. Inst. of Tech. v. Abacus Software*, 462 F.3d 1344, 1354 (Fed. Cir. 2006) ("The term 'mechanism' standing alone connotes no more structure than the term 'means'"). Media Rights nevertheless contends that "'compliance mechanism' is . . . a specific mechanism—a tangible thing." Media

5

Rights Technologies, Inc.'s Opening Claim Construction Br. at 7. This contention, however, is difficult to reconcile with Media Rights' own proposed definition of "compliance mechanism" as "[a] set of actions or processes of a computer system (or systems) that enforce usage restrictions applicable to media content." That proposed definition suggests that a compliance mechanism is software, and not what one would ordinarily think of as "a tangible thing."

Further, the claims do not, as Media Rights argues, elucidate the structure of "compliance mechanism." The claims indicate that the compliance mechanism is coupled to a client system, a "media content presentation application," and a "custom media device," and that the compliance mechanism is activated in response to the client system receiving media content, "control[s] a data output path of [the] client system," and "monitor[s]" a "controlled data pathway." But this language merely explains how the components of the invention fit together and the functions performed by the compliance mechanism; it says nothing about the structure of the compliance mechanism itself. Thus, the Court concludes that the claims themselves do not recite a sufficient structure, and "compliance mechanism" must be construed as a means-plus-function term.

The first step, then, is to identify the function performed by the compliance mechanism. Based on the claims, the "compliance mechanism" performs the following functions:

> (1) "controlling a data output path of [the] client system . . . by diverting a commonly used data pathway of [the] media player application to a controlled data pathway" (Claim 1);
>
> (2) monitoring the controlled data pathway (Claims 1, 10 and 19);
>
> (3) "managing an output path of [the] client system . . . by diverting a commonly used data pathway of [the] media player application to a controlled data pathway" (Claim 10); and

6

(4) "stop[ping] or disrupt[ing] the playing of [the] media content file at [the] controlled data pathway when said playing of said media file content is outside of [the] usage restriction applicable to said media file" (Claims 10 and 19).

'033 patent at 36-37.

The next step is to identify the structure in the specification that performs these functions. Capital One suggests that the corresponding structure is the "copyright compliance mechanism (CCM) 300" disclosed in Figure 3 of the '033 patent, including each of the following components: (a) Instructions 301; (b) User ID Generator 302; (c) Coder/decoder 303; (d) Agent Programs 304; (e) System Hooks 305; (f) Skins 306; (g) Custom Media Device Driver 307; and (h) Wave Shim 309. Media Rights does not appear to contest that, if "compliance mechanism" is a means-plus-function term, the corresponding structure is generally disclosed by "copyright compliance mechanism 300" in Figure 3. Rather, Media Rights contends that, under a means-plus-function construction, the compliance mechanism does not necessarily include all of the identified components, as Capital One contends. As Media Rights describes it, "[t]he '033 patent is clear . . . that the identified components can be mixed and matched as appropriate to the application," and "[t]he specific description of the various components of the compliance mechanism removes any doubt that any of the components are mandatory." Media Rights Technologies, Inc.'s Opening Claim Construction Br. at 9-10.

If, however, the disclosed structure need not include any particular components, as Media Rights reads its patent, the specification in effect discloses no structure at all. Presumably recognizing this issue, Media Rights, at the *Markman* hearing, contended that the specification indicates that some, but not all, of the specified components are required, and directed the Court

to the language describing the components, which it said indicates which elements are necessarily included. *See* Hearing Tr. ("Tr.") at 67:15-20, 83:7-18 (November 5, 2013).

The specification suggests, as Media Rights contends, that "copyright compliance mechanism 300" need not include all of the specified components. On that point, the specification indicates that "[c]opyright compliance mechanism 300 is configured to be operable while having portions of components, entire components, combinations of components, and/or comp, e.g., 210, 220, and/or 230." '033 patent at 8:19-22. While incomplete, this sentence does indicate that copyright compliance mechanism 300 includes combinations of the various components; and in describing the components, the specification indicates that certain components are present *in one embodiment*, while describing other components without such a limitation. *Compare* '033 patent at 8:32-33 ("*in one embodiment*, CCM 300 is shown to include instructions 301 . . ."); *id.* at 8:38-39 ("The copyright compliance mechanism 300 also includes, *in one embodiment*, a user ID generator 302."); *id.* at 9:55-57 ("Copyright compliance mechanism 300 also includes one or more system hooks 305, *in one embodiment of the present invention*."); *id.* at 11:9-11 ("*In one embodiment*, this can be performed within a driver shim, e.g., wave driver shim 309 of Figs. 5A and 5B"); *id.* at 13:21-23 ("*In one embodiment*, copyright compliance mechanism 300 also includes one or more custom media device driver(s) 307 . . . .") (emphasis added), *with id.* at 9:13-15 ("copyright compliance mechanism 300 further includes one or more coder/decoders (codec) 303 . . . ."); *id.* at 9:36-37 ("copyright compliance mechanism 300 also includes one or more agent programs 304"); *id.* at 12:35-36 ("copyright compliance mechanism 300 also includes one or more skins 306"). Overall, this language suggests that copyright compliance mechanism 300 necessarily includes one or more coder/decoders, one or more agent

programs, and one or more skins, but not instructions, a user ID generator, system hooks, a wave shim, or a custom media device driver.

The question then reduces to whether this description constitutes a sufficiently definite structure to withstand § 112, ¶ 2. The Federal Circuit has made clear that "the corresponding structure for a § 112, ¶ 6 claim for a computer-implemented function is the algorithm disclosed in the specification." *Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241, 1249 (Fed. Cir. 2005). For a claim term to be definite, "a recited algorithm . . . need not be so particularized as to eliminate the need for any implementation choices by a skilled artisan; but it must be sufficiently defined to render the bounds of the claim—declared by section 112(f) to cover the particular structure and its equivalents—understandable by the implementer." *Ibormeith IP, LLC v. Mercedes-Benz USA, LLC*, 732 F.3d 1376, 1379 (Fed. Cir. 2013).

According to the specification, the coder/decoder, "in one embodiment, [is] adapted to perform, but [is] not limited to, encoding/decoding of media files, compressing/decompressing of media files, detecting that delivered media files are encrypted as prescribed by CCM 300." '033 patent at 9:14-19. Essentially, a coder/decoder changes the format of incoming media content. The specification further reveals that the components labeled "agent programs" "are configured to engage in dialogs and negotiate and coordinate transfer of information between a computer system . . . a server . . . and/or media player applications . . . in one embodiment." '033 patent at 9:37-43. By this definition, agent programs would appear to be necessary components of any software. Finally, skins "are customizable interfaces that, in one embodiment, are displayed on a display device . . . of computer system 210 and provide functionalities for user interaction of delivered media content." '033 patent at 12:41-45.

9

In *Ibormeith*, the Federal Circuit addressed the definiteness of a means-plus-function term in a patent covering the monitoring of conditions affecting or indicating a driver's sleepiness and the issuing of a warning to the driver. At issue was the term "computational means," which were to "take account of sleepiness-related time-of-day information to determine the likelihood of driver sleepiness and to produce an output that . . . triggers a warning." *Ibormeith*, 732 F.3d at 1377. The Court concluded that the patent specification did not provide a sufficient algorithm for the term "computational means" because, even though it identified factors related to driver drowsiness, it did not disclose any concrete relationship between the various factors. Even if the specification could be read as disclosing a single algorithm that simply added the various factors, the court noted, Ibormeith had disclaimed such an interpretation and should be bound by that admission. Based on Ibormeith's reading, according to which the specification "cover[ed] all ways of taking into account the listed variables, or some subset of the variables," the specification did not provide "an algorithm whose terms [we]re defined and understandable." *Id.* at 1381.

The algorithm disclosed in this case, which, according to Media Rights, consists of some combination of the identified components, suffers from the same deficiency as in *Ibormeith*. Of the elements that seem to be required, only the skins provide any real idea of how the compliance mechanism achieves the requisite functions, and this alone is insufficient to provide any concrete relationship between the various components and "an algorithm whose terms are defined and understandable." *Id.* Moreover, even if the specification could be read to disclose a single structure containing all of the elements pictured in Figure 3, and even if such a structure would be sufficiently definite, Media Rights has disclaimed such an interpretation. *See Ibormeith*, 732

F.3d at 1381 (patentee's disclaimer of an interpretation constitutes a binding admission). The Court therefore holds that the term "compliance mechanism" is indefinite because the specification does not disclose sufficient structure.[2]

### B. <u>Custom Media Device</u>

Media Rights contends that "custom media device" should be construed as "[a]n application or driver specific to the media content being played, viewed, or otherwise presented." Capital One contends that the term is "insolubly ambiguous."

From the claims themselves, all that is clear about the custom media device is that the media content is directed to the custom media device, which selectively restricts the output of the media content. Media Rights does not argue that "custom media device" has a commonly understood meaning; rather, it suggests that its meaning is clear from the specification. In support of this position, Media Rights first points to the portion of the specification that explains that "[a] client computer system, e.g., 210, can be configured to utilize a custom media device application, e.g., custom media device 310 . . . to control unauthorized recording of media content files." '033 patent at 13:24-28. From this description, Media Rights deduces that "[t]he patentee is plainly equating a custom media device and a custom media device application," and

---

[2] At the *Markman* hearing, Media Rights seemed to argue that one of ordinary skill in the art would understand when individual components are required based on the particular functions performed by the compliance mechanism. *See* Tr. at 75-76. Media Rights has failed, however, to offer a cogent description of the circumstances under which given components are necessary, and the Court concludes that the specification does not describe such circumstances sufficiently to disclose "an algorithm whose terms are defined and understandable." *Ibormeith*, 732 F.3d at 1381. Particularly significant in this regard is that Media Rights' expert's report fails to include any discussion of the term "compliance mechanism" or indicate that one skilled in the art would understand the bounds of the claim, including the particular structure and its equivalents. *See* Media Rights Technologies, Inc.'s Responsive Claim Construction Br. Ex. 2, Declaration of Ivan Zatkovich.

that the custom media device therefore can be an application. Media Rights Technologies, Inc.'s Opening Claim Construction Br. at 19-20. Media Rights then points to the specification's teaching that "[i]n one embodiment, custom media device 310 . . . is an emulation of the custom media device driver 307." '033 patent at 13:32-34. This explanation, Media Rights contends, demonstrates that the custom media device can be a driver.

The specification does seem to equate "custom media device" and "custom media device application," but this hardly helps to clarify the meaning of custom media device. Capital One's expert asserts—and Media Rights' expert does not contest—that the term "device" is typically understood to connote hardware, while "application" is typically understood to connote software. *See* Capital One's Opening Claim Construction Br. Ex. G, Chatterjee Declaration, at 10. Indeed, the specification uses the term "device" numerous times to refer to hardware. *See, e.g.*, '033 patent at 2:32-34; *id.* at 5:1-11; *id.* at 5:66-6:2. Further uncertainty arises when one considers that the custom media device is, in one embodiment, "an emulation" of a custom media device driver, '033 patent at 13:32-34, while in another embodiment, the custom media device driver emulates the custom media device, '033 patent at 14:23-24, and that the specification at other points equates the custom media device to a driver, '033 patent at 14:21-24. According to Capital One's expert on this point, an "emulator" is "generally understood by one of ordinary skill in the art to mean hardware and/or software that duplicates (or *emulates*) the functions of one computer system . . . in a different computer system . . . such that the duplicated (or *emulated*) behavior closely resembles the behavior of the real system."[3] Capital One's Opening Claim Construction

---

[3] Capital One's expert also expressed his overall opinion that "[i]t is not clear how a custom media device or custom media device driver can be an emulation of the other." Capital One's Opening Claim Construction Br. Ex. G, Chatterjee Declaration, at 11. Media Rights' expert did

Br. Ex. G, Chatterjee Declaration, at 11. Given this explanation, the specification indicates that the custom media device and custom media device driver can each duplicate the behavior of the other, and that they might also be the same. Far from clarifying the meaning of "custom media device," this portion of the specification further confuses the matter.

Putting aside the question whether the custom media device is hardware, software, or both, the specification fails to satisfactorily convey what makes the custom media device "custom." In its claim construction briefs, Media Rights emphasizes the following language of the specification: "A custom media device application can be, but is not limited to, a custom media audio device application for media files having sound content, a custom video device application for media files having graphical and/or numerical content, etc." '033 patent at 13:28-32. According to Media Rights, this language teaches that the custom media device is "specific to the type of media content being played, viewed, or presented (e.g., custom media audio device for sound content and custom media video device for graphical content)." Media Rights Technologies, Inc.'s Opening Claim Construction Br. at 20. But defining "custom" to mean "specific to the type of media" provides no differentiation or special attributes for the term "custom," as any media player is specific to the type media being played.

Apparently recognizing this problem, Media Rights disclaimed such a construction at the *Markman* hearing, contending that "custom" means specific to the particular media content, not the type of media content. *See* Tr. at 84-85. In support, Media Rights pointed to the following portion of the specification:

---

not respond to Capital One's expert on this point or to Capital One's expert's other opinions pertaining to the custom media device. Indeed, Media Rights' expert did not discuss the term "custom media device" at all in his report.

13

> In one embodiment of the present invention, a specialized or custom media player may be involved in order to experience the media content, e.g., skin 306 of Fig. 3. Skin 306 may be implemented when CCM 300 cannot modify an industry standard media player application to comply with copyright restrictions and/or licensing agreements in accordance with the DMCA. Alternatively, a specialized or custom media player may not be needed to experience the media content.

'033 patent at 32:26-36.[4] Media Rights stated that "custom media device" and "custom media player" are "perhaps used interchangeably," thus suggesting that the custom media device may be a media player specialized in accordance with the relevant copyright or licensing restrictions to prevent the user from performing certain functions, for example recording. *See* Tr. at 79, 128-32.

Assuming that the meaning of "custom media player" is itself sufficiently clear, the problem with Media Rights' construction is that it does not appear from the specification that "custom media player" and "custom media device" are in fact synonyms. First, one would expect that the portion of the specification that Media Rights relies on to define "custom media device" would actually reference that term, which it does not. Further, the specification indicates that the custom media player "may be involved" in "one embodiment" of the invention, and alternatively, "may not be needed," while the custom media device is necessarily present in every embodiment of the invention. Finally, Media Rights insists that the custom media device may be an application or a driver, and the "custom media player" described in the specification seems to be limited to an application. *See* '033 patent at 17:67-18:3, 32:29-32 (indicating that a

---

[4] The specification also discusses the use of a custom media player at another point, using similar language. *See* '033 patent a 17:64-18:5 ("In one embodiment of the present invention, a specialized or custom media player may or may not be required to experience the media content, e.g., skin 306 of FIG. 3. A skin 306 may be necessary when CCM 300 cannot modify an industry standard media player application to comply with copyright restrictions and/or licensing agreements in accordance with the DMCA. Alternatively, an industry standard media player can be utilized by client computer system 210 to experience the media content.").

14

custom media player can be used when CCM 300 cannot modify an industry standard media player application). Thus, while a custom media player might be one manifestation of a custom media device, it is not at all evident that the term "custom media device" is so limited.

Because the claims and specification fail to define the bounds of the term "custom media device," they do not "give notice to the public of the extent of the legal protection afforded by the patent." *All Dental Prodx, LLC*, 309 F.3d at 779. The Court therefore concludes that the term "custom media device" is indefinite.[5]

## IV. CONCLUSION

The terms "compliance mechanism" and "custom media device" play a central role in every claim of the '033 patent, and, having concluded that those terms are indefinite, the Court

---

[5] For the first time in its responsive claim construction brief, Capital One suggests that "custom media device" is a means-plus-function term falling within the scope of § 112, ¶ 6. *See* Capital One's Responsive Claim Construction Br. at 10-11. Indeed, the Federal Circuit has made clear that "device," like "means" and "mechanism," is a generic term that "typically do[es] not connote sufficiently definite structure" to escape § 112, ¶ 6. *Mass Inst. of Tech.*, 462 F.3d at 1354. And "custom media device" does not have any inherent structure. Thus, § 112, ¶ 6 would seem to apply. However, because the parties did not focus on this issue in their briefs or at the *Markman* hearing, the Court will not rely on a "means-plus-function" analysis and will construe the term "custom media device" without reference to § 112, ¶ 6. Nevertheless, it does appear to the Court, without deciding, that "custom media device" is also indefinite if construed as a means-plus-function term. First, a structure disclosed in the specification is a "corresponding structure" for purposes of § 112, ¶ 6 only if "the specification or prosecution history clearly links or associates that structure to the function recited in the claim." *B. Braun Med., Inc.*, 124 F.3d at 1424. The specification in this case does not disclose any structure that is clearly linked to the function performed by the custom media device, *i.e.*, selectively restricting the output of the media content. Further, even if the "custom media player" identified in the specification is an embodiment of the custom media device and the term could be limited to that embodiment, the specification only makes clear that the "custom media player" is specialized, potentially through the use of a skin, in order to ensure compliance with copyright restrictions or licensing agreements. This description does not disclose an algorithm that is "sufficiently defined to render the bounds of the claim . . . understandable by the implementer." *Ibormeith*, 732 F.3d at 1379.

holds that the entire patent is invalid. It is therefore unnecessary to construe the other disputed terms.

Accordingly, it is hereby

ORDERED that Claims 1-27 of the '033 patent are indefinite under 35 U.S.C. § 112, ¶ 2; and it is further

ORDERED, based on the claims construction stated herein, that the '033 patent involved in this action be, and the same hereby is, declared invalid and unenforceable and that this action be, and the same hereby is, DISMISSED with prejudice.

The Clerk is directed to forward copies of this Order to all counsel of record and to enter judgment in defendant's favor pursuant to Fed. R. Civ. P. 58.

/s/
_____
Anthony J. Trenga
United States District Judge

Alexandria, Virginia
December 9, 2013